UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DOROTHEA EMMONS and LISA STAPLETON, individually, and on behalf of other members of the general public similarly situated, and as aggrieved employees,<br><br>Plaintiffs,<br><br>v.<br><br>QUEST DIAGNOSTICS CLINICAL LABORATORIES, INC., a Delaware corporation; QUEST DIAGNOSTICS INCORPORATED, doing business as QUEST DIAGNOSTICS INCORPORATED OF NEVADA, a Nevada corporation; QUEST DIAGNOSTICS NOCHOLS INSTITUTE, a California corporation; DOES 1 through 10, inclusive,<br><br>Defendants. | No. 1:13-cv-00474-DAD-BAM<br><br>ORDER GRANTING FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND AWARDING ATTORNEYS' FEES<br><br>(Doc. Nos. 86, 88) |

On October 14, 2016, plaintiffs Dorothea Emmons and Lisa Stapleton ("plaintiffs") filed a motion for attorneys' fees. (Doc. No. 86.) Shortly thereafter, plaintiffs filed a motion for final approval of a class action settlement on November 4, 2016. (Doc. No. 88.) Neither motion was opposed, and on December 20, 2016, the court held a hearing with attorneys Robert Drexler and Ed Santos appearing on behalf of plaintiffs. No appearance was made on behalf of defendants. At the hearing, the court requested plaintiffs submit additional evidence with respect to the issue

of commonality, and plaintiffs did so on February 6, 2017. (Doc. No. 94.) For the reasons that follow, the court grants final approval of this class action settlement and the requested award of attorneys' fees and costs.

## BACKGROUND

This action was removed from Stanislaus County Superior Court under the Class Action Fairness Act on April 1, 2013. (Doc. No. 1.) The complaint alleges Quest Diagnostics Clinical Laboratories, Inc., Quest Diagnostics Incorporated, and Quest Diagnostics Nochols Institute ("defendants") violated California labor law by failing to (1) pay overtime wages, (2) pay minimum wages, (3) provide meal periods, (4) provide rest breaks, (5) pay all wages owed upon termination, (6) provide accurate wage statements, and (7) pay business-related expenses. Plaintiffs further allege violations of California Labor Code § 2698 and California Business and Professions Code § 17200. (*Id*. at 24–37.) Plaintiffs sought relief both on their own behalf and on behalf of a proposed main class and two proposed subclasses consisting of non-Floater and Floater Phlebotomists employed by defendants. (*Id*. at 16–17.)

Preliminary approval of the class action settlement was granted by the court on June 22, 2016. (Doc. No. 81.) In that order, the court: (1) conditionally certified a class for the purposes of settlement and granted preliminary approval of that settlement; (2) approved plaintiffs as class representatives; (3) confirmed Capstone Law APC as class counsel; (4) approved Simpluris, Inc. as the settlement administrator; (5) approved the notice to be sent to class members; and (6) directed notice be sent to class members and set a hearing date for final approval. (Doc. No. 81 at 15.) The class conditionally certified by the court was designated as follows:

> All persons who worked as "Floater" or "Non-Floater" Phlebotomists for Defendants in California at any time during the period from April 29, 2011 to the date of Preliminary Approval.

(*Id.* at 4.)

Settlement administrator Simpluris, Inc. mailed the class notice to the 2,730 class members on September 14, 2016. (Doc. No. 88-2 at ¶ 5.) Eighty-six of those class notices were returned by the post office, and after seeking new addresses for these individuals, sixty-four were successfully delivered. (*Id.* at ¶ 6.) The remaining twenty-two class notices were deemed

2

1 undeliverable. (*Id.* at ¶ 7.) The settlement administrator received one request for exclusion, and
2 no objections to the settlement, leaving 2,707 valid class members to whom the settlement fund
3 may be distributed. (*Id.* at ¶¶ 8–9.) The average recovery was $548.06 and the highest award
4 was $2,137.24. (*Id.* at ¶ 7.)

5     The current motions for attorneys' fees and for final approval of the class action
6 settlement were filed on October 14, 2016 and November 4, 2016, respectively. (Doc. Nos. 86,
7 88.) The motions are uncontested and no objections to the settlement were raised to either the
8 settlement administrator or this court. Having conducted the final fairness hearing and carefully
9 considered the terms of the settlement, the court now turns to the issues of: final certification of
10 the class; whether the proposed settlement is ultimately fair, reasonable, and adequate; and
11 whether class counsel's request for attorneys' fees and costs should be granted.

12           **FINAL CERTIFICATION OF SETTLEMENT CLASS**

13     The court previously conditionally certified the proposed settlement class. (*See* Doc. No.
14 81 at 3–8.) Therefore, the court will not revisit the certification analysis, save and except as
15 discussed below. In its prior order, the court specifically stated that it "expects further evidence
16 in the form of declarations and affidavits will be submitted prior to the fairness hearing" on the
17 issues of commonality and adequacy of representation. (*Id.* at 6–7.) The court also must consider
18 a final analysis of predominance under Rule 23(b)(3).

19         a.    <u>Commonality</u>

20     Rule 23(a) demands "questions of law or fact common to the class." Fed. R. Civ. P.
21 23(a)(2). The rule does not require all questions of law or fact be common to every single class
22 member. The raising of any common question, however, does not suffice. *See Wal-Mart Stores,*
23 *Inc. v. Dukes*, 564 U.S. 338, 349 (2011) ("[a]ny competently crafted class complaint literally
24 raises common 'questions.'") (quoting Nagareda, Class Certification in the Age of Aggregate
25 Proof, 84 N.Y.U. L. Rev. 97, 131–132 (2009)); *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970,
26 981 (9th Cir. 2011) ("In other words, Plaintiffs must have a common question that will connect
27 many individual promotional decisions to their claim for class relief.") Rather, class
28 representatives must demonstrate common points of facts and law will drive or resolve the

litigation. *Dukes*, 564 U.S. at 350 ("What matters to class certification . . . is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation.") (internal citations omitted). To satisfy Rule 23(a)'s commonality requirement, a class claim "must depend upon a common contention . . . of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id*.

In further support of their initial request for certification, plaintiffs have filed several declarations from the named plaintiffs and submitted several of defendants' human resources policy documents to establish commonality. Plaintiff Emmons worked as a phlebotomist for defendant in Modesto, California from January 2006 to August 2011. (Doc. No. 91-2 at ¶ 2.) Plaintiff Stapleton worked as a "floater" phlebotomist for defendant in Hayward, California from November 2001 to June 2012. (Doc. No. 91-3 at ¶ 2.) Plaintiffs declare that they "were discouraged by [their] managers from recording hours worked in excess of 8 a day and 40 a week," and consequently "often had to work off-the-clock before or after our scheduled shifts to attend to our patients' needs." (Doc. Nos. 91-2 at ¶ 4; 91-3 at ¶ 4.) They also noted defendants' "general practice of understaffing its labs," resulting in phlebotomists frequently being denied sufficient rest breaks, as well as being denied second rest breaks on sufficiently long shifts. (Doc. Nos. 91-2 at ¶¶ 5–6; 91-3 at ¶¶ 5–6.) Plaintiff Stapleton also declares she drove hundreds of miles for work between defendants' facilities, for which she was not appropriately reimbursed. (Doc. No. 91-3 at ¶ 7.) Both plaintiffs declare they believe their claims "are typical of other class members because they arise from the same factual basis and are based on the [same] Labor Code violations." (Doc. Nos. 91-2 at ¶ 7, 91-3 at ¶ 8.)

Additionally, plaintiffs supplied a declaration from their counsel Robert Drexler, in which he notes that Quest produced California-wide policies during discovery related to meal periods, rest periods, and business expense reimbursement policies. (Doc. No. 94-1 at 2.) Each of these policies was attached as an exhibit, and they require in part that employees be given a half-hour meal break period within their first five hours of work. (*Id.* at 3–10.) This is what is required by

California labor law. *See* Cal. Code Regs. Tit.8, § 11050 (11)(A) ("No employer shall employ any person for a work period of more than five (5) hours without a meal period of not less than 30 minutes . . ."). Plaintiffs also supplied a declaration from Michael O'Brien, a computer forensics investigator retained by plaintiffs to analyze a randomized sample of defendants' records for the purpose of identifying meal period violations. (Doc. No. 91-1 at ¶¶ 5, 8.) According to Mr. O'Brien, he identified 87,655 shifts out of 239,845 shifts at least five hours in length for which no applicable rest period was taken. (*Id.* at ¶ 9.) Given the information provided by plaintiffs' counsel as supplemented and summarized above, the court finds that there are sufficiently common questions of law and fact to warrant granting final class certification in this matter. *See* Fed. R. Civ. P. 23(a)(2); *Dukes*, 564 U.S. at 350.

    b.   Adequacy of Representation

The court's prior order preliminarily granted class certification because "plaintiffs have overlapping interests with the class members and have asserted they will vigorously pursue the action; there are no apparent conflicts between plaintiffs' claims and the class members' claims; and plaintiffs are represented by experienced and competent counsel." (Doc. No. 81 at 6.) The prior order noted declarations stating as much would be required prior to final certification and approval of the class settlement.

Declarations from the named plaintiffs have since been submitted, and recount that they reviewed the class settlement and "believe the settlement is fair and reasonable and adequately compensates Class Members." (Doc. Nos. 86-2 at ¶ 5; 87 at ¶ 5.) Both plaintiffs state that, based on their experiences working for defendants, they believe their "claims are typical of other class members because they arise from the same factual basis and are based on the [same] Labor Code violations." (Doc. Nos. 91-2 at ¶ 7; 91-3 at ¶ 8.) Plaintiffs also declare that they had multiple conferences with class counsel about the factual bases for the claims to be pursued, reviewed the major filings in the case, and reached their own determinations of whether the settlement was fair. (Doc. Nos. 86-2 at ¶¶ 3–6; 87 at ¶ 3–6.)

One of the two declarations filed by plaintiffs' counsel indicates that counsel "determin[ed] the suitability of the putative class representatives, through interviews, background

investigations, and analyses of their employment files and related records." (Doc. No. 88-1 at ¶ 8.)  This declaration indicates attorney Robert Drexler has more than 25 years of experience as a litigator, and has represented numerous classes in wage-and-hour and consumer rights class actions.  (Doc. No. 88-1 at ¶ 10.)  The declaration lists nine class action cases plaintiffs' counsel has experience in litigating.  (*Id.*)  Further, the declaration lists dozens of class actions that attorneys from counsel's firm have been involved in since 2012.  (*Id.* at ¶¶ 13–14.)

These declarations are sufficient to show plaintiffs' counsel can adequately serve as class counsel and that the named plaintiffs vigorously pursued the action.  Nothing in the settlement agreement or the declarations submitted by named plaintiffs indicates their approval of the settlement was conditioned on the receipt of the requested incentive award, discussed below, or that they are at odds with the absent class members.  Their interests are sufficiently aligned with the class to support the adequacy of their representation.  The court therefore finds this prong of the analysis met, and will grant final certification of the class.

         c.         <u>Predominance</u>

In the court's prior order, it noted that predominance was satisfied for the purposes of the conditional certification then issued.  (Doc. No. 81 at 7.)  Since plaintiffs seek final approval of the settlement and certification of the class, the court must confirm the predominance element is satisfied.  *See* Fed. R. Civ. P. 23(b)(3).  While predominance is similar to the Rule 23(a)(2) commonality requirement, the standard is much higher at this stage of the analysis.  *Dukes*, 564 U.S. at 359; *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 624–25 (1997); *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022 (9th Cir. 1998).  While Rule 23(a)(2) can be satisfied by even a single question, Rule 23(b)(3) requires convincing proof the common questions "predominate."  *Amchem*, 521 U.S. at 623–24; *Hanlon*, 150 F.3d at 1022.  "When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis."  *Hanlon*, 150 F.3d at 1022.

Here, the common issues predominate over any individual issues.  Based on the complaint and declarations submitted by plaintiffs, it is apparent the thrust of this dispute focuses on common issues

of whether individuals were paid overtime and were paid for rest breaks in accordance with both applicable labor law and company policy. There is sufficient evidence, much of which has been detailed above, to show these determinations would be based on both company policies and time records kept by the company. (*See, e.g.*, Doc. Nos. 86-1, 86-2, 87, 88-1, 91-2, 91-3, 94-1.) Therefore, predominance is satisfied, and the class is certified as follows:

> All persons who worked as "Floater" or "Non-Floater" Phlebotomists for Defendants in California at any time during the period from April 29, 2011 to June 21, 2016.

## FINAL APPROVAL OF CLASS ACTION SETTLEMENT

A class action may be settled only with the court's approval. Fed. R. Civ. P. 23(e). "Approval under 23(e) involves a two-step process in which the Court first determines whether a proposed class action settlement deserves preliminary approval and then, after notice is given to class members, whether final approval is warranted." *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 525 (C.D. Cal. 2004). At the final approval stage, the primary inquiry is whether the proposed settlement "is fundamentally fair, adequate, and reasonable." *Lane v. Facebook, Inc.*, 696 F.3d 811, 818 (9th Cir. 2012); *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998). "It is the settlement taken as a whole, rather than the individual component parts, that must be examined for overall fairness." *Hanlon*, 150 F.3d at 1026 (citing *Officers for Justice v. Civil Serv. Comm'n of S.F.*, 688 F.2d 615, 628 (9th Cir. 1982)); *see also Lane*, 696 F.3d at 818–19. Having already completed a preliminary examination of the agreement, the court reviews it again, mindful that the law favors the compromise and settlement of class action suits. *See, e.g., In re Syncor ERISA Litig.,* 516 F.3d 1095, 1101 (9th Cir. 2008); *Churchill Village, LLC. v. Gen. Elec.*, 361 F.3d 566, 576 (9th Cir. 2004); *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992); *Officers for Justice*, 688 F.2d at 625 (9th Cir. 1982). Ultimately, "the decision to approve or reject a settlement is committed to the sound discretion of the trial judge because he [or she] is exposed to the litigants and their strategies, positions, and proof." *Staton v. Boeing Co*., 327 F.3d 938, 953 (9th Cir. 2003) (quoting *Hanlon*, 150 F.3d at 1026).

/////

> Assessing a settlement proposal requires the district court to balance a number of factors: the strength of the plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the proposed settlement.

*Hanlon*, 150 F.3d at 1026 (citing *Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1375 (9th Cir. 1993)); *see also Lane*, 696 F.3d at 819. "To survive appellate review, the district court must show it has explored comprehensively all factors[.]" *Allen v. Bedolla*, 787 F.3d 1218, 1223 (9th Cir. 2015) (quoting *Dennis v. Kellogg Co.*, 697 F.3d 858, 864 (9th Cir. 2012)); *Hanlon*, 150 F.3d at 1026.

      a.    <u>Strength of Plaintiff's Case</u>

When assessing the strength of plaintiff's case, the court does not reach "any ultimate conclusions regarding the contested issues of fact and law that underlie the merits of this litigation." *In re Wash. Pub. Power Supply Sys. Sec. Litig.*, 720 F. Supp. 1379, 1388 (D. Ariz. 1989). The court cannot reach such a conclusion, because evidence has not been fully presented. *Id*. Instead, the court is to "evaluate objectively the strengths and weaknesses inherent in the litigation and the impact of those considerations on the parties' decisions to reach these agreements." *Id*.

Here, plaintiffs have brought serious allegations and counsel's declaration discusses the discovery and investigation that went into this case, including discovery related to class size, relevant labor policies, and examination of employee time and wage records. (Doc. No. 88-1 at ¶¶ 6–8.) The court concludes plaintiff's case is certainly not without merit.

      b.    <u>The Risk, Expense, Complexity, and Likely Duration of Further Litigation and the Risk of Maintaining Class Action Status Through Trial</u>

Both parties to this case face significant risks from continued litigation. Defendants noted in their removal documents that plaintiffs sought damages upward of $8.5 million. (Doc. No. 1 at 6–7.) Further, plaintiffs have encountered significant legal and factual hurdles during the litigation which, despite their belief in the strength of their case, increase the risk of litigation.

1  (Doc. No. 88 at 13.) The potential difficulty with maintaining class certification, even in the face
2  of allegedly unlawful written policies, weighed in plaintiff's analysis of the settlement. (*Id.*)
3  Further, significant expense would have to be incurred in continuing to litigate the case. (*Id.* at
4  14–15.) Additionally, this case has already been in litigation for almost four years. Subsequent
5  litigation in the absence of a settlement would presumably include a contested class certification
6  hearing, dispositive motions for summary judgment at the close of discovery, and potentially a
7  lengthy trial. All of these proceedings could take years to fully resolve. Thus, the risk, expense,
8  and likely duration of further litigation support the court's approval of a final settlement.

        c.        The Amount Offered in Settlement

10 The total proposed settlement is for $2.35 million. Assuming the requested attorneys' fees
11 and litigation costs are granted to plaintiffs' counsel and the court approves a $15,000 payment to
12 California's Labor and Workforce Development Agency ("LWDA"), $25,000 in settlement
13 administration costs, and class representative payments of $8,000 each, the net settlement amount
14 to be distributed to class members is $1,495,667. One class member has opted out, and therefore
15 the class amount will be distributed over 2,729 individuals. The average recovery is $548.06,
16 while the highest amount of recovery being $2,137.24. (Doc. No. 88-2 at ¶ 7.) Any uncashed
17 checks or settlement checks returned as undeliverable will be paid to the California Department
18 of Industrial Relations Unpaid Wage Fund, according to the terms of the settlement agreement.
19 (Doc. No. 74-1 at ¶ 53.) The court concludes this settlement pays a reasonable amount of what
20 each settlement class member may be owed.

        d.        The Extent of Discovery Completed and the Stage of the Proceedings

22 It appears that a considerable amount of discovery was exchanged in this matter. (Doc.
23 No. 88-1 at ¶ 6.) In addition to the formal and informal discovery conducted, plaintiff's counsel
24 conducted investigation to determine the class size, the extent and frequency of the violations,
25 and the day-to-day circumstances that gave rise to the violations. (Doc. No. 88-1 at ¶¶ 6–7.)
26 Further, the parties participated in a full day of mediation with Barry Winograd serving as an
27 independent mediator. (Doc. No. 88-1 at ¶ 9.) This supports the conclusion that the settlement is
28 "not the product of fraud or overreaching by, or collusion among, the negotiating parties." *Class*

*Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1290 (9th Cir. 1992) (quoting *Ficalora v. Lockheed Cal. Co.*, 751 F.2d 995, 997 (9th Cir. 1985)); *see also Rodriguez v. West Publishing Corp.*, 563 F.3d 948, 965 (9th Cir. 2009).

  e. <u>The Experience and Views of Counsel</u>

Plaintiffs' counsel are qualified attorneys from a law firm with extensive experience handling class actions and labor law litigation.  (Doc. No. 88-1 at ¶¶ 10–14.)  Plaintiffs' counsel believes this settlement "constitutes a fair, adequate, and reasonable compromise of the claims at issue."  (Doc. No. 88-1 at ¶ 9.)  This too supports approval of the settlement.

  f. <u>The Presence of a Governmental Participant</u>

Plaintiff sought to enforce claims under California's Private Attorneys General Act ("PAGA") on behalf of the state and affected employees.  The settlement will result in a $20,000 PAGA penalty payment.  This too weighs in favor of approval.  *See Adoma v. Univ. of Phoenix, Inc.*, 913 F. Supp. 2d 964, 977 (E.D. Cal. 2012); *Zamora v. Ryder Integrated Logistics, Inc.*, No. 13cv2679-CAB (BGS), 2014 WL 9872803, at *10 (S.D. Cal. Dec. 23, 2014) (factoring civil PAGA penalties in favor of settlement approval).

  g. <u>The Reaction of the Class Members to the Proposed Settlement</u>

In this case, the settlement administrator utilized skip tracing to locate class members for whom mail was initially returned.  (Doc. No. 88-2 at ¶ 6.)  Only twenty-two class members were unable to be contacted by mailed class notice, out of a total prospective class of 2,730.  (*Id.* at ¶¶ 5–6.)  The notice advised potential class members that they could object to the settlement and could seek to exclude themselves from it.  (*Id.* at 7–8.)  No objections were submitted to the administrator, and only one timely request for exclusion was submitted.  (*Id.* at ¶¶ 8–9.)  No objections to the class settlement were raised at the final fairness hearing.  The absence of objections to a proposed class action settlement supports the conclusion that the settlement is fair, reasonable, and adequate.  *See National Rural Telecomms. Coop.*, 221 F.R.D. at 529 ("The absence of a single objection to the Proposed Settlement provides further support for final approval of the Proposed Settlement.") (citing cases); *Barcia v. Contain-A-Way, Inc.*, 3:07-cv-00938-IEG-JMA, 2009 WL 587844, at *4 (S.D. Cal. 2009).

Accordingly, all factors weigh in favor of granting final approval and the court will approve the settlement.

**ATTORNEYS' FEES, INCENTIVE PAYMENTS, AND OTHER EXPENSES**

In addition to final certification of the class and approval of the class action settlement, plaintiffs' counsel also seek attorneys' fees and costs, incentive payments to the class representatives, approval of payments to the settlement administrator and the LWDA under the PAGA. For the reasons discussed below, the court approves these payments.

a. <u>The Requested Attorneys' Fees are Reasonable</u>

This court has an "independent obligation to ensure that the award, like the settlement itself, is reasonable, even if the parties have already agreed to an amount." *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 941 (9th Cir. 2011). This is because, when fees are to be paid from a common fund, the relationship between the class members and class counsel "turns adversarial." *In re Mercury Interactive Corp. v. Securities Litigation*, 618 F.3d 988, 994 (9th Cir. 2010); *In re Washington Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1302 (9th Cir. 1994). As such, the district court assumes a fiduciary role for the class members in evaluating a request for an award of attorneys' fees from the common fund. *Id.*; *see also Rodriguez v. Disner*, 688 F.3d 645, 655 (9th Cir. 2012); *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 968 (9th Cir. 2009).

In a diversity action such as this, federal courts apply state law both to determining the right to fees and the method of calculating them. *See Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047 (9th Cir. 2002); *Mangold v. California Public Utils. Comm'n*, 67 F.3d 1470, 1478 (9th Cir. 1995).

The California Supreme Court recently held that the percentage-of-fund method of calculating attorneys' fees survives in California courts. *Laffitte v. Robert Half Int'l Inc.*, 1 Cal. 5th 480, 503–06 (2016). A court "may determine the amount of a reasonable fee by choosing an appropriate percentage of the fund created." *Id.* at 503. The California Supreme Court suggested considerations of the risks and potential value of the litigation, the contingency, novelty, and difficulty of the litigation, the skill shown by counsel, and a lodestar cross-check were all

11

appropriate means of discerning an appropriate percentage award in a common fund case. *Id.* at 504. Notably, while the California Supreme Court recognized the Ninth Circuit's 25 percent benchmark for percentage awards in common fund cases, it did not adopt such a benchmark for California cases. *Id.* at 495, 503–06. In common fund percentage award cases, the Ninth Circuit has similarly provided a non-exhaustive list of factors to use in assessing the reasonableness of the award, including

> [T]he extent to which class counsel achieved exceptional results for the class, whether the case was risky for class counsel, whether counsel's performance generated benefits beyond the cash settlement fund, the market rate for the particular field of law (in some circumstances), the burdens class counsel experienced while litigating the case (e.g., cost, duration, foregoing other work), and whether the case was handled on a contingency basis.

*In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 954–55 (9th Cir. 2015) (internal quotation marks omitted) (quoting *Vizcaino*, 290 F.3d at 1047–50). The Ninth Circuit has permitted courts to award attorneys' fees using this method "in lieu of the often more time-consuming task of calculating the lodestar." *Bluetooth*, 654 F.3d at 942.

Here, plaintiffs' attorneys seek an award of attorneys' fees equal to one-third, or 33 percent, of the common fund. (Doc. No. 86 at 14–28.) Numerous factors support this requested award. This litigation was pursued purely on a contingency-fee basis, and counsel spent approximately 840 hours and almost $12,000 in out-of-pocket expenses litigating the case over almost four years. Absent successful resolution, none of this attorney time would have been compensated. (*Id.* at 20.) *See also Vizcaino*, 290 F.3d at 1048 ("Risk is a relevant circumstance."). Plaintiffs' attorneys also successfully vindicated the rights of over two thousand workers and secured more than $2 million in relief. Further, counsel for plaintiffs are seasoned, experienced litigators of wage-and-hour class actions. Consideration of each of these factors support a 33 percent award of attorneys' fees here.

The court next turns to the lodestar amount, in order to cross-check the requested attorneys' fee award's reasonableness. Beyond simply the multiplication of a reasonable hourly rate by the number of hours worked, a lodestar multiplier is typically applied. "Multipliers in the 3–4 range are common in lodestar awards for lengthy and complex class action litigation." *Van*

12

*Vranken v. Atlantic Richfield Co.*, 901 F. Supp. 294, 298 (N.D. Cal. 1995) (citing *Behrens v. Wometco Enters., Inc.*, 118 F.R.D. 534, 549 (S.D. Fla. 1988)); *see also* 4 NEWBERG ON CLASS ACTIONS § 14.7 (courts typically approve percentage awards based on lodestar cross-checks of 1.9 to 5.1 or even higher, and "the multiplier of 1.9 is comparable to multipliers used by the courts"); *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 341 (3d Cir. 1998) ("[M]ultiples ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied.") (quoting NEWBERG).

Here, plaintiffs' counsel submits a declaration indicating that fifteen different attorneys at the firm worked on this case for times ranging between nineteen and more than 160 hours. (Doc. No. 86-1 at ¶ 16.) These attorneys billed approximately 840 hours at rates between $370 and $495 for associates and $545 and $695 for senior counsel and partners. (*Id.*) These rates have been accepted as reasonable by other courts. *See e.g.*, *Klee v. Nissan N. Am., Inc.*, No. 12-08238 AWT, 2015 WL 4538426, at *13 (C.D. Cal. July 7, 2015) (accepting similar rates for Capstone attorneys). Moreover, the declaration notes counsel elected to discretionarily waive approximately $25,000 in attorneys' fees "[i]n the exercise of billing discretion." (Doc. No. 86-1 at ¶ 16.) The court sees no reason to question these billed amounts, which result in a lodestar figure of $461,179. Given the requested one-third award of $783,333 in attorneys' fees, the lodestar cross-check reflects a multiplier of approximately 1.7, which is on the low end of acceptable potential modifiers. This too supports the reasonableness of an award of attorneys' fees equal to one-third of the total fund in this case.

   b.  <u>Counsel's Requested Expenses are Reasonable</u>

In addition to the fee award, plaintiffs' counsel requests an award for the out-of-pocket expenses incurred in litigating this case. (Doc. No. 86 at 28–29.) Expense awards "should be limited to typical out-of-pocket expenses that are charged to a fee paying client and should be reasonable and necessary." *In re Immune Response Secs. Litig.*, 497 F. Supp. 2d 1166, 1177 (S.D. Cal. 2007). These can include reimbursements for "(1) meals, hotels, and transportation; (2) photocopies; (3) postage, telephone, and fax; (4) filing fees; (5) messenger and overnight delivery; (6) online legal research; (7) class action notices; (8) experts, consultants, and

13

investigators; and (9) mediation fees." *Id*. Here, counsel has provided an itemized list totaling $11,962.74 in expenses paid. (Doc. No. 86-1 at ¶ 19.) This total amount includes $725 for copying, printing, and scanning costs; $3,420 for court fees, filings, and service; $59.96 for delivery and messenger services; $1,495.39 for investigative services; $4,060 in mediation fees; $769.55 for postage and mailings; $173.80 for legal research service fees; and $1,259.04 in travel-related costs and expenses. (*Id.*) These expenses are all reasonable and necessary types of charges, and would be the type of expenses typically billed to a fee-paying client. Therefore, the court finds these expenses to be reasonable.

        c.      <u>The Requested Class Representative Incentive Payments are Reasonable</u>

"Incentive awards are fairly typical in class action cases." *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 958–59 (9th Cir. 2009). However, the decision to approve such an award is a matter within the court's discretion. *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 463 (9th Cir. 2000). Generally speaking, incentive awards are meant to "compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general." *Rodriguez*, 563 F.3d at 958–59. The Ninth Circuit has emphasized that "district courts must be vigilant in scrutinizing all incentive awards to determine whether they destroy the adequacy of the class representatives . . . . [C]oncerns over potential conflicts may be especially pressing where, as here, the proposed service fees greatly exceed the payments to absent class members." *Radcliffe v. Experian Info. Sols., Inc.*, 715 F.3d 1157, 1165 (9th Cir. 2013) (internal quotation marks and citation omitted). A class representative must justify an incentive award through "evidence demonstrating the quality of plaintiff's representative service," such as "substantial efforts taken as class representative to justify the discrepancy between [her] award and those of the unnamed plaintiffs." *Alberto v. GMRI, Inc.*, 252 F.R.D. 652, 669 (E.D. Cal. 2008). Incentive awards are particularly appropriate in wage-and-hour actions where a plaintiff undertakes a significant "reputational risk" by bringing suit against their former employers. *Rodriguez*, 563 F.3d at 958–59. The district court must evaluate their awards individually, using "'relevant factors includ[ing] the actions the plaintiff has taken to protect the interests of the class,

the degree to which the class has benefitted from those actions, . . . the amount of time and effort the plaintiff expended in pursuing the litigation . . . and reasonabl[e] fear[s of] workplace retaliation.'" *Staton v. Boeing Co.*, 327 F.3d 938, 977 (9th Cir. 2003) (quoting *Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998)).

Here, the named plaintiffs, Dorothea Emmons and Lisa Stapleton, seek incentive payments of $8,000 each. (Doc. No. 86 at 30.) The named plaintiffs assert they have incurred considerable reputational risk in serving as class representatives, expended considerable time and effort in contributing to the litigation, and have agreed to a broader release of claims than the standard class members. (*Id.* at 30–32.) The named plaintiffs submitted declarations which recount that they had multiple conferences with their attorneys prior to filing suit, closely reviewed and approved the initial complaint, worked closely with the attorneys throughout the litigation, and remained on-call during settlement negotiations. (Doc. Nos. 86-2 at ¶¶ 3–5; 87 at ¶¶ 3–5.) Further, both named plaintiffs state they reviewed the settlement and accepted it only after assuring themselves the settlement was fair. (Doc. Nos. 86-2 at ¶ 5; 87 at ¶ 5.) Each plaintiff declares they spent "approximately 30-40 hours assisting [their] attorneys in the prosecution of this lawsuit." (Doc. Nos. 86-2 at ¶ 6; 87 at ¶ 6.) In addition to the broader release signed by the named plaintiffs, the settlement agreement stipulates that neither plaintiff will apply to be re-hired by defendants or any of their associated entities. (Doc. No. 74-1 at ¶ 30.) While incentive payments of $8,000 are a number of times larger than the average class member recovery of $550, they are not outside the realm of what has been approved as reasonable by other courts. *See, e.g.*, *Taylor v. FedEx Freight, Inc.*, No. 1:13-cv-01137-DAD-BAM, 2016 WL 6038949, at *8 (approving a $10,000 incentive award where average awards were estimated to be $2,616); *Ontiveros v. Zamora*, 303 F.R.D. 356, 366 (E.D. Cal. 2014) (approving $15,000 incentive payments for average recovery of $3,700); *Clayton v. Knight Transp.*, No. 1:11-cv-00735-SAB, 2014 WL 1154098 at *2, 6 (E.D. Cal. Mar. 21, 2014) (awarding $3,500 incentive payment where average recovery was approximately $150); *Davis v. Brown Shoe Co., Inc.*, No. 1:13-cv-01211-LJO-BAM, 2015 WL 6697929 at *12 (E.D. Cal. Nov. 3, 2015) (approving $7,000 incentive payments were average class recovery was approximately $400). Nothing in the

declarations from the named plaintiffs or the settlement agreement indicates their agreement to the settlement was conditioned on a promise of them receiving an incentive award. Therefore, the court finds these incentive payments are fair and that they do not destroy the adequacy of class representation.

d. <u>Payment to the Settlement Administrator and PAGA Payment are Reasonable</u>

The settlement administrator filed a declaration with the court noting that it has been and will be responsible for the following tasks: (1) printing and mailing the class notice; (2) receiving undeliverable class notices; (3) receiving and validating requests for exclusion; (4) calculating settlement payments; (5) mailing settlement checks and tax-reporting materials; and (6) answering questions from class members. (Doc. No. 88-2 at ¶ 2.) According to the representative, the class administrator incurred $25,000 in costs in connection with the administration of the settlement. (Doc. No. 88-2 at ¶ 10.) The motion seeks to pay the settlement administrator $25,000. (Doc. No. 88 at 18.) Additionally, the settlement agreement contemplates that $20,000 of the settlement will be allocated to the resolution of the PAGA claim, of which 75 percent of that will be paid to the LWDA. (Doc. No. 88 at 17–18.) The court finds these costs reasonable, as it has in other cases. *See Taylor*, 2016 WL 6038949 at *9.

## CONCLUSION

After reviewing the materials submitted and conducting a final fairness hearing, the court observes no evidence of collusion between the parties and notes that all factors brought to its attention support the granting of final approval of the settlement and certification of the class. Accordingly, the settlement is approved as fair and reasonable, the class is certified for purposes of this settlement, and class counsel's motion for attorneys' fees, expenses, and class representative payments is granted.

Given the foregoing, the court:

1) Grants the motions for final approval of the class action settlement and for attorneys' fees (Doc. Nos. 86, 88);

2) Finds the terms of the proposed settlement agreement to be fair, adequate, and reasonable in compliance with Rule 23(e) of the Federal Rules of Civil Procedure;

3) Confirms Capstone Law APC as class counsel and approves the requested fee of $783,333, as well as $11,962.74 in costs, both to be paid from the settlement fund;

4) Confirms Simpluris, Inc. as the settlement administrator and approves $25,000 in costs and expenses to be paid to Simpluris, Inc. from the settlement fund;

5) Finds plaintiffs Emmons and Stapleton are suitable class representatives and orders payment to them of $8,000 each out of the settlement fund;

6) Orders that the settlement awards be made and administered in accordance with the terms of the settlement agreement to the 2,707 valid class members;

7) Finds that under the California Labor Codes' Private Attorneys General Act ("PAGA"), California Labor Code § 2699, *et seq.*, a PAGA payment of $20,000 is reasonable and apportions that payment as follows: $15,000 to the LWDA and $5,000 to the settlement class members, to be distributed pursuant to the claims process defined the settlement agreement;

8) Directs that, in accordance with the settlement agreement and California Labor Code §§ 96.6 and 96.7, any undeliverable settlement checks or settlement checks that remain uncashed after 120 days be paid to the California Department of Industrial Relations Unpaid Wage Fund;

9) Enters this final judgment and directs the parties to act in accordance with the terms in the settlement agreement; and

10) Retains jurisdiction over this matter for the purposes of enforcing the settlement agreement and issuing any orders in connection therewith.

IT IS SO ORDERED.

Dated: **February 24, 2017**                              *Dale A. Drozd*
                                                          UNITED STATES DISTRICT JUDGE